**FILED**
**04-28-2023**
**Clerk of Circuit Court**
**Brown County, WI**
**2023CV000543**
**Honorable Thomas J. Walsh**
**Branch 2**

| STATE OF WISCONSIN | CIRCUIT COURT | BROWN COUNTY |
|---|---|---|

WHITE HAIR SOLUTIONS, LLC
2222American Boulevard
De Pere, WI 54115,

       Plaintiff,

v.                                                       Case No.:

GIDEON CAPITAL INVESTMENTS &            Case Code: 30106
MANAGEMENT, LLC
c/o Chuck Walker, Registered Agent
2540 Executive Center Circle,
Suite DPT#25100
Tallahassee, FL 32301-5015,

DIEGO AIZCORBE
223 Baracoa Court
St. Augustine, FL  32086,

CHUCK WALKER
153 Ceasar Place
Hilton Head, NC 29926,

INGENUITY CONSULTING SERVICES
L.L.C.
c/o Barbara Przybysz, Registered Agent
1759 Oakvale Drive SW
Wyoming, MI 49519,

ROBERT PRZYBYSZ
1759 Oakvale Drive SW
Wyoming, MI 49519,

PETRON ENERGY II, INC.
c/o Nevada Agency and Transfer Company,
Registered Agent
50 West Liberty Street, Suite 880
Reno, NV 89501,

and

FLOYD L. SMITH
4402 Dexham Road
Rowlett, TX 75088

       Defendants.

---

## SUMMONS

---

To each person named above as a Defendant:

    You are hereby notified that the Plaintiff named above has filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

    Within 45 days of receiving this, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the Court, whose address is Brown County Clerk of Courts, 100 S Jefferson Street, Green Bay, WI 54301, and to Plaintiff's attorney, DeWitt LLP, whose address is 2391 Holmgren Way, Suite A, Green Bay, WI 54304. You may have an attorney help or represent you.

    If you do not provide a proper answer within 45 days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment or seizure of property.

2

Dated at Green Bay, Wisconsin, this 28th day of April, 2023.

**DEWITT LLP**

By:    _Electronically signed by Brian T. Flood_
Brian T. Flood (1061313)
2391 Holmgren Way, Suite A
Green Bay, WI 54304
Telephone: (920) 499-5700
Facsimile: (920) 499-9790
Email: bflood@dewittllp.com

**Attorneys for White Hair Solutions, LLC**

3

FILED
04-28-2023
Clerk of Circuit Court
Brown County, WI
2023CV000543
Honorable Thomas J.
Walsh
Branch 2

| STATE OF WISCONSIN | CIRCUIT COURT | BROWN COUNTY |

WHITE HAIR SOLUTIONS, LLC
2222American Boulevard
De Pere, WI 54115,

       Plaintiff,

v.

GIDEON CAPITAL INVESTMENTS &
MANAGEMENT, LLC
c/o Chuck Walker, Registered Agent
2540 Executive Center Circle,
Suite DPT#25100
Tallahassee, FL 32301-5015,

DIEGO AIZCORBE
223 Baracoa Court
St. Augustine, FL  32086,

CHUCK WALKER
153 Ceasar Place
Hilton Head, NC 29926,

INGENUITY CONSULTING SERVICES
L.L.C.
c/o Barbara Przybysz, Registered Agent
1759 Oakvale Drive SW
Wyoming, MI 49519,

ROBERT PRZYBYSZ
1759 Oakvale Drive SW
Wyoming, MI 49519,

PETRON ENERGY II, INC.
c/o Nevada Agency and Transfer Company,
Registered Agent
50 West Liberty Street, Suite 880
Reno, NV 89501,

Case No.:

Case Code: 30106

and

FLOYD L. SMITH
4402 Dexham Road
Rowlett, TX 75088

        Defendants.

---

# COMPLAINT

---

NOW COMES the Plaintiff, White Hair Solutions, LLC, through its attorneys, DeWitt LLP, complaining of the above-named Defendants, alleges and states as follows:

## PARTIES AND VENUE

1.     Plaintiff, White Hair Solutions, LLC ("White Hair"), is a limited liability company organized under the laws of the State of Wisconsin whose principal office is located at 2222 American Boulevard in De Pere, Wisconsin.

2.     Gideon Capital Investments & Management, LLC ("Gideon"), is, upon information and belief, a foreign limited liability company organized under the laws of Florida, with a principal office located at 2540 Executive Center Circle, Suite DPT#25100 in Tallahassee, Florida. Upon information and belief, Gideon's registered agent is Chuck Walker, who is located at 2540 Executive Center Circle, Suite DPT#25100 in Tallahassee, Florida.

3.     Defendant, Diego Aizcorbe ("Aizcorbe"), is, upon information and belief, an adult resident of the State of Florida, residing at 223 Baracoa Court in St. Augustine, Florida.

4.     Defendant, Chuck Walker ("Walker"), is, upon information and belief, an adult resident of the State of North Carolina, residing at 153 Ceasar Place in Hilton Head, North Carolina.

5.      Ingenuity Consulting Services L.L.C., ("Ingenuity"), is, upon information and belief, a foreign limited liability company organized under the laws of Michigan, with a principal office located at 1759 Oakvale Drive SW in Wyoming, Michigan. Upon information and belief, Ingenuity's registered agent is Barbara Przybysz, who is located at 1759 Oakvale Drive SW in Wyoming, Michigan.

6.      Defendant, Robert Przybysz ("Przybysz"), is, upon information and belief, an adult resident of the State of Michigan, residing at 1759 Oakvale Drive SW in Wyoming, Michigan.

7.      Defendant, Petron Energy II, Inc. ("Petron"), is, upon information and belief, a foreign corporation organized under the laws of Nevada, with a principal office located at 17950 Preston Road, Suite 960, in Dallas, Texas. Upon information and belief, Petron's registered agent is Nevada Agency and Transfer Company, which is located at Reno, Nevada.

8.      Defendant, Floyd L. Smith ("Smith"), is, upon information and belief, an adult resident of the State of Texas, residing at 4402 Dexham Road in Rowlett, Texas.

9.      Venue is proper in this Court pursuant to Wis. Stat. § 801.50(2)(a) as Brown County, Wisconsin is the county in which the claims arose.

10.      This Court has personal jurisdiction over the Defendants pursuant to Wis. Stat. §§ 801.05(2), (4)(a), and (5)(a) – (c).

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF/FACTS

11.      On or before September 29, 2021, Przybysz solicited White Hair on behalf of and to provide short-term financing ("Loan") for a transaction ("Transaction") involving Gideon and Petron.

12.      Upon information and belief, at the time of the solicitation and all times thereafter, Przybysz was an agent, employee, and/or member of Ingenuity.

3

13.     Upon information and belief, Ingenuity and Gideon were joint venturers such that at the time of the solicitation of White Hair and all times thereafter, Przybysz was an agent of the joint venture.

14.     On September 29, 2021, Przybysz represented in an email ("September 29, 2021 Email") to White Hair that the Transaction involved the monetization of carbon credits in which revenue would be generated as a result of the carbon credits without having to sell same. Przybysz further represented to White Hair that the carbon credits would be deposited with a Global Trust Depository ("GTD"), which would issue a safekeeping receipt ("SKR"). The SKR and carbon credits would serve as security for a standby letter of credit in the amount of approximately $100,000,000.

15.     The carbon credits ("Carbon Credits") at issue in the Transaction were alleged to have been owned by Petron.

16.     Upon information and belief, the scheme as and between Defendants was such that Petron would contribute Carbon Credits to the Transaction, Gideon would market the Carbon Credits, and Ingenuity would seek investors and participants for the Transaction.

17.     Upon information and belief, the funding of the Transaction and monetization of the Carbon Credits was governed by a Joint Venture Agreement ("JV Agreement") by and between Petron and Gideon.

18.     Przybysz further represented to White Hair in the September 29, 2021 Email that prior to funds being loaned against the standby letter of credit, GTD was to acquire an insurance wrap, which was to be paid for by both GTD, as well as Petron as the owner of the Carbon Credits.

4

Petron was required to contribute $1,000,000 for its share of the insurance wrap, which it did not have and, as a result, needed a short-term loan in this amount.

19.     Pursuant to the September 29, 2021 Email, Przybysz represented to White Hair that there was "no risk for the money put up for the insurance wrap," as GTD had purchased a surety bond ("Surety Bond") to "mitigate all risk."

20.     In a September 30, 2021 email ("September 30, 2021 Email"), Przybysz purported to correct a misstatement in the September 29, 2021 Email as the referenced surety bond was not being purchased by GTD, but by Ingenuity's joint venture partner, Gideon.  According to the September 30, 2021 Email, "[t]he Surety Bond has already been issued for this transaction and it has been provided to Gideon . . . and [Gideon] will assign the Surety Bond to [White Hair]."

21.     On October 1, 2021, Przybysz forwarded to White Hair documents purported to validate the Carbon Credits owned by Petron.

22.     On October 4, 2021, Przybysz emailed a redacted or "sanitized" copy of the Surety Bond to White Hair.  A true and accurate copy of the "sanitized" Surety Bond is attached hereto and incorporated herein as Exhibit A.

23.     On October 5, 2021, to induce White Hair to agree to the Loan, Przybysz represented in an email to White Hair that Gideon would execute a written assignment of the Surety Bond to White Hair to guaranty both the return of the principal amount of the Loan by White Hair to Petron, as well as interest on the Loan.

24.     On October 5, 2021, to induce White Hair to agree to the Loan, Przybysz represented in a second email to White Hair that Petron would agree to secure the Loan with the Carbon Credits as collateral.

5

25. On October 9, 2021, to induce White Hair to agree to the Loan, Przybysz emailed White Hair a Fed Ex receipt purportedly representing the transmission of the Carbon Credits from Petron to GTD.

26. On October 13, 2021, to induce White Hair to agree to the Loan, Przybysz represented that Ingenuity would agree to share up to $3,000,000 in revenue with White Hair. In furtherance of this promise, Przybysz forwarded to White Hair an executed Revenue Sharing Agreement ("Revenue Sharing Agreement"). A true and accurate copy of the Revenue Sharing Agreement is attached hereto and incorporated herein as Exhibit B.

27. On or about October 14, 2021, Petron executed a Promissory Note ("Promissory Note"), in which it agreed to borrow from White Hair the principal sum of $1,000,000. Petron was to repay to White Hair the principal sum borrowed, as well as an additional $2,000,000, on or before April 14, 2022. A true and accurate copy of the Promissory Note is attached hereto and incorporated herein as Exhibit C.

28. On or about October 15, 2022, as instructed and based on the representations made by Przybysz, White Hair wired $1,000,000 to a bank account held by Gideon.

29. In addition to the Promissory Note, Petron and White Hair entered into a Security Agreement ("Security Agreement") on or about October 15, 2021. Pursuant to the Security Agreement, Petron's obligations under the Promissory Note were to be paid in the following order: (1) from the Revenue Sharing Agreement, (2) from proceeds received from the Surety Bond, and (3) from a transfer of a portion of the Carbon Credits. A true and accurate copy of the Security Agreement is attached hereto and incorporated herein as Exhibit D.

6

30.     Despite previous representations to the contrary, on October 7, 2021, Gideon assigned the Surety Bond to Petron and not to White Hair.

31.     Petron failed or refused to assign the Surety Bond to White Hair.

32.     On January 26, 2022, Przybysz informed White Hair the payment of $3,000,000 would be made to White Hair the week of January 31, 2022.

33.     The $3,000,000 payment was not made to White Hair during the week of January 31, 2022.

34.     On or about February 7, 2022, and again on February 14, 2022, Przybysz promised White Hair that payment of the $3,000,000 was forthcoming.

35.     As of April 5, 2022, Przybysz still represented Petron's expectation that payment in full under the Promissory Note would occur on or before the maturity date of April 14, 2022.

36.     On April 12, 2022, Smith, the Chief Executive Officer of Petron, informed White Hair that the monetization of the Carbon Credits did not occur.  While this communication referenced a transfer of a portion of the Carbon Credits from Petron to Gideon, Smith did not mention nor indicate any payment would be forthcoming from the Surety Bond.

37.     On April 29, 2022, White Hair met with Przybysz, Aizcorbe, and Walker ("April 29, 2022 Meeting").  During this meeting, White Hair was informed that various entities performed due diligence on the Carbon Credits and determined them to be fraudulent.

38.     During the April 29, 2022 Meeting, Aizcorbe and Walker acknowledged taking possession of White Hair's $1,000,000 payment through Gideon.

7

39.    During the April 29, 2022 Meeting, White Hair was informed that the Surety Bond was voided because the Carbon Credits were fraudulent.  Despite the Surety Bond allegedly being voided, Defendants have been unable to obtain a refund of the amounts allegedly paid for same.

40.    Upon information and belief and at all times relevant, Defendants knew the Carbon Credits were fraudulent.

41.    Upon information and belied, the Surety Bond was never purchased and evidence of same was fraudulent.

42.    Upon information and belief, Defendants knew the Surety Bond was fraudulent.

43.    Upon information and belief, Defendants' goal for the April 29, 2022 Meeting was to convince White Hair Solutions not to enforce its rights against Defendants.

**COUNT I**
**VIOLATION OF WIS. STAT. § 100.18**
**(All Defendants)**

44.    White Hair incorporates herein by reference all of the allegations set forth above.

45.    Przybysz represented to White Hair that he, in conjunction with the other Defendants, was offering a "no risk" financial opportunity backed by both the Surety Bond and Carbon Credits.

46.    Przybysz represented to White Hair that he, in conjunction with the other Defendants, had done the requisite due diligence on the validity of the Carbon Credits.

47.    These representations were untrue, deceptive, and misleading.

48.    These representations were made as part of a scheme and conspiracy by and between the Defendants to convince White Hair and others to loan or invest money for monetization of the purported Carbon Credits..

8

49.    At the time of the representations, Defendants had no intention of repaying the $1,000,000 paid by White Hair.

50.    White Hair is a member of the public as that term is used in Wis. Stat. § 100.18.

51.    White Hair has suffered a pecuniary loss as a result of the misrepresentations made by Przybysz in furtherance of the conspiracy.

52.    In addition to an award of damages in the amount of the pecuniary loss suffered by White Hair, White Hair is entitled to recover its attorney's fees pursuant to Wis. Stat. § 100.18(11)(b)2.

## <u>COUNT II</u>
## INTENTIONAL MISREPRESENTATION
### (All Defendants)

53.    White Hair incorporates herein by reference all of the allegations set forth above.

54.    Przybysz represented to White Hair that he, in conjunction with the other Defendants, was offering a "no risk" financial opportunity backed by both the Surety Bond and Carbon Credits.

55.    Przybysz represented to White Hair that he, in conjunction with the other Defendants, had done the requisite due diligence on the validity of the Carbon Credits.

56.    These representations were untrue, deceptive, and misleading.

57.    These representations were made as part of a scheme and conspiracy by and between the Defendants to convince White Hair to loan or invest money for monetization of the purported Carbon Credits.

58.    Defendants knew these representations were untrue or were made recklessly without caring whether they were true or false.

9

59.     Przybysz made the misrepresentations on behalf of and with full knowledge of Defendants in order to induce White Hair to rely upon same and make a loan payment in the amount of $1,000,000.

60.     White Hair believed the misrepresentations and reasonably relied upon same when making the loan payment in the amount of $1,000,000.

61.     White Hair has suffered a pecuniary loss as a result of the misrepresentations made by Przybysz in furtherance of the conspiracy.

62.     White Hair is also entitled to an award of punitive damages as against the Defendants for the intentional misrepresentations.

<u>**COUNT III**</u>
**STRICT RESPONSIBILITY MISREPRESENTATION**
**(All Defendants)**

63.     White Hair incorporates herein by reference all of the allegations set forth above.

64.     Przybysz represented to White Hair that he, in conjunction with the other Defendants, was offering a "no risk" financial opportunity backed by both the Surety Bond and Carbon Credits.

65.     Przybysz represented to White Hair that he, in conjunction with the other Defendants, had done the requisite due diligence on the validity of the Carbon Credits.

66.     These representations were untrue, deceptive, and misleading.

67.     These representations were made as part of a scheme and conspiracy by and between the Defendants to convince White Hair to loan or invest money for monetization of the purported Carbon Credits.

10

68.     Defendants knew or were made under circumstances that they should have known that these representations were untrue such that the representations would work as a deceit.

69.     Defendants had an economic interest in White Hair making the loan payment in the amount of $1,000,000, which was induced the misrepresentations on behalf of and with full knowledge of Defendants.

70.     White Hair believed the misrepresentations and reasonably relied upon same when making the loan payment in the amount of $1,000,000.

71.     White Hair has suffered a pecuniary loss as a result of the misrepresentations made by Przybysz in furtherance of the conspiracy.

## COUNT IV
## NEGLIGENT MISREPRESENTATION
### (All Defendants)

72.     White Hair incorporates herein by reference all of the allegations set forth above.

73.     Przybysz represented to White Hair that he, in conjunction with the other Defendants, was offering a "no risk" financial opportunity backed by both the Surety Bond and Carbon Credits.

74.     Przybysz represented to White Hair that he, in conjunction with the other Defendants, had done the requisite due diligence on the validity of the Carbon Credits.

75.     These representations were untrue, deceptive, and misleading.

76.     These representations were made as part of a scheme and conspiracy by and between the Defendants to convince White Hair to loan or invest money for monetization of the purported Carbon Credits.

11

77.    Defendants knew or reasonably should have known these representations were untrue.

78.    Przybysz made the misrepresentations on behalf of and with full knowledge of Defendants in order to induce White Hair to rely upon same and make a loan payment in the amount of $1,000,000.

79.    White Hair believed the misrepresentations and reasonably relied upon same when making the loan payment in the amount of $1,000,000.

80.    White Hair has suffered a pecuniary loss as a result of the misrepresentations made by Przybysz in furtherance of the conspiracy.

**COUNT V**
**THEFT BY FRAUD**
**(All Defendants)**

81.    White Hair incorporates herein by reference all of the allegations set forth above.

82.    White Hair brings this claim pursuant to Wis. Stats. §§ 895.446 and 943.20(1)(d).

83.    Przybysz made false representations to White Hair that he, in conjunction with the other Defendants, was offering a "no risk" financial opportunity backed by both the Surety Bond, that the Carbon Credits were valid, and that he had performed the requisite due diligence on the validity of the Carbon Credits.

84.    These representations were made as part of a scheme and conspiracy by and between the Defendants to receive money from White Hair.

85.    Defendants knew that the representations were false.

86.    Defendants made the false representations with the intent to deceive and defraud White Hair and to induce her to make a payment into an account controlled by Gideon.

12

87.    Defendants received money from White Hair to which it was not entitled as a result of Przybysz's false representations.

88.    White Hair was deceived and defrauded due to Przybysz's false representations.

89.    White Hair has suffered a pecuniary loss as a result of the false representations made by Przybysz in furtherance of the conspiracy.

90.    Pursuant to Wis. Stat. § 895.446(3), White Hair is entitled to actual damages, all costs of investigation and litigation, including attorney fees, and exemplary damages.

### COUNT VI
### THEFT
### (All Defendants)

91.    White Hair incorporates herein by reference all of the allegations set forth above.

92.    White Hair brings this claim pursuant to Wis. Stats. §§ 895.446 and 943.20(1)(a).

93.    Przybysz made false representations to White Hair that he, in conjunction with the other Defendants, was offering a "no risk" financial opportunity backed by both the Surety Bond, that the Carbon Credits were valid, and that he had performed the requisite due diligence on the validity of the Carbon Credits.

94.    These representations were made as part of a scheme and conspiracy by and between the Defendants to receive money from White Hair.

95.    White Hair believed the misrepresentations and reasonably relied upon same when making the loan payment in the amount of $1,000,000.

96.    Upon learning that the representations were untrue, White Hair demanded the return of the $1,000,000 loan payment.

13

97.     White Hair believed the misrepresentations and reasonably relied upon same when making the loan payment in the amount of $1,000,000.

98.     Despite demand by and without consent of White Hair, Defendants have failed or refused to return the $1,000,000 and are depriving White Hair of possession of said monies.

99.     White Hair has suffered a pecuniary loss as a result of the theft of the $1,000,000 loan payment.

100.    Pursuant to Wis. Stat. § 895.446(3), White Hair is entitled to actual damages, all costs of investigation and litigation, including attorney fees, and exemplary damages.

### COUNT VII
### CIVIL CONSPIRACY PURSUANT TO WIS. STAT. § 134.01
### (All Defendants)

101.    White Hair incorporates herein by reference all of the allegations set forth above.

102.    Defendants acted together by agreeing to, combining, associating, or mutually undertaking a common purpose.

103.    Defendants' common purpose was to injure White Hair's business, business interests and assets.

104.    Defendants acted with the common purpose to injure White Hair's business, business interests and assets acted with a malicious motive.

105.    Defendants intentionally concealed the existence of the common purpose from White Hair.

106.    Defendants' conduct violates Wis. Stats. § 134.01.

107.    As a direct and proximate result of Defendants' actions, White Hair has sustained economic damage, for which Defendants are jointly and severally liable.

14

## COUNT VIII
### VIOLATION OF WIS. STAT. § 946.83
### WISCONSIN ORGANIZED CRIME CONTROL ACT (WOCCA)
### (All Defendants)

108.    White Hair incorporates herein by reference all of the allegations set forth above.

109.    Pursuant to Wis. Stat. § 946.82(2), Defendants are an enterprise.

110.    Pursuant to Wis. Stat. § 946.82(2), Defendants formed an association in fact.

111.    Defendants are each associated with the enterprise by the association of fact.

112.    Pursuant to Wis. Stat. § 946.83(3), the Defendants were employed by, or associated with, the enterprise.

113.    Pursuant to Wis. Stat. § 946.83(3), the Defendants conducted or participated, directly or indirectly, in the enterprise through a pattern of racketeering activity.

114.    The Defendants intended to misrepresent invoices, alleged contracts, agreements, records, values, security interests, and financial statements to White Hair.

115.    Each Defendant is distinct from this enterprise and has an additional, legitimate business.

116.    Pursuant to Wis. Stat. §§ 946.82(3)-(4), Defendants engaged in at least three incidents of racketeering activity, that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics by:

    a.   Violating 18 U.S.C. 1961(1);

    b.   Violating Wis. Stat. § 134.05;

        i.   Defendants formed a conspiracy and sought to cause White Hair loss of business or business opportunity; reduced profits; and economic losses;

15

ii.    As described in Wis. Stat. § 134.05(1), the Defendants paid an agent, employee or servant of one or more of the Defendants' businesses commissions, a gift or gratuity with the intent to influence the agent's, employee's, or servant's action in relation to the business of the agent's employee's or servant's principal, employer, or master;

iii.   Some or all of the individual Defendants are agents, employees, or servants of a larger enterprise or entities;

iv.    As described in Wis. Stat. § 134.05(2)(a), Defendants, corruptly requested or accepted a gift, gratuity, or promise to make a gift or do an act beneficial to himself, under an agreement or with an understanding that he shall act in any particular manner in relation to the business of the agent's, employee's or servant's principal, employer, or master;

v.     As described in Wis. Stat. § 134.05(2)(b), Defendants, are authorized to procure materials, supplies, or other articles either by purchase or contract for his/its principal, employer, or master, or to employ service or labor for his/its principal, employer, or master;

vi.    As described in Wis. Stat. § 134.05(2)(b), Defendants, received, directly or indirectly, for itself/himself or for another, a commission, discount, or bonus from the person who makes such sale or contract, furnishes such materials, supplies, or other articles, or from a person who renders such service or labor;

vii.   As described in Wis. Stat. § 134.05(3), the Defendants are persons who gave or offered an agent, employee, or servant a commission, discount, or bonus;

viii.  The unlawful actions arising out of the conspiracy of the Defendants have caused White Hair financial injury for which the Defendants are jointly and severally liable.; and

c.   Violating Wis. Stat. § 943.20;

117.   Upon information and belief, the first and last incident occurred within seven years of each other.

118.   The Defendants, through a pattern of racketeering activity, directly or indirectly, acquired or maintained an interest in or control of an enterprise and/or real property.

16

119.    The Defendants received money, consideration and/or revenue as proceeds.  These proceeds were received with the knowledge that the proceeds were derived from a pattern of racketeering activity.

120.    The Defendants subsequently used or invested these proceeds in the establishment or operation of an enterprise by transferring assets into the Defendants' other companies' accounts.

121.    As a direct and proximate result of the Defendants' pattern of racketeering activity, White Hair suffered damages pursuant to Wis. Stat. § 946.87(4).

**COUNT IX**
**ACQUISITION AND CONTINUANCE OF AN INTEREST IN AND**
**CONTROL OF AN ENTERPRISE IN A PATTERN OF RACKETEERING**
**ACTIVITY PURSUANT TO 18 U.S.C. § 1962(a)**
**(All Defendants)**

122.    White Hair incorporates herein by reference all of the allegations set forth above.

123.    Pursuant to 18 U.S.C. § 1961(1), Defendants engaged in racketeering activity by:

a.    Violating 18 U.S.C. § 1343 when the Defendants conducted financial transactions with the fraudulently acquired assets using wire or other means, to inject and commingle these assets with other assets of the Defendants; to take money from White Hair under false pretenses and to conceal the fraudulent actions;

b.    Violating 18 U.S.C. §1952(a)(1) when the Defendants travelled in interstate commerce, and/or used any facility in interstate commerce, with the intent to distribute proceeds from their unlawful activity, as defined in 18 U.S.C. § 1952(b).

c.    Repeatedly violating 18 U.S.C. § 1952(a)(3) when the Defendants promoted, managed, established, carried on, or facilitated the promotion, management, establishment, or carrying on, of the unlawful activity, as defined under 18 U.S.C. § 1952(b). The

17

Defendants' unlawful activity includes, but is not limited to, violating 18 U.S.C. §§ 1956 and/or 1957.

       d.     Violating 18 U.S.C. §1956 when the Defendants conducted a financial transaction using property that they knew was fraudulently obtained. The Defendants intended to promote the carrying on of the fraudulent activities and knew the Transaction was designed in whole or part to conceal the nature, source, or ownership of the proceeds from the fraudulent actions.

       e.     Violating 18 U.S.C. §1957 when the Defendants knowingly engaged in a monetary transaction that used criminally derived property that had a value greater than $10,000 and was derived from fraudulent activity. Such offenses took place within the United States, pursuant to 18 U.S.C. §1957(d).

124.    Pursuant to 18 U.S.C. § 1961(3), the Defendants, individuals and entities capable of holding a legal or beneficial interest in property, are persons.

125.    Upon information and belief, Defendants are an enterprise.

126.    Upon information and belief, Defendants are each associated with the enterprise by the association of fact.

127.    Pursuant to 18 U.S.C. § 1961(4), Defendants formed an association in fact, and that association is an "enterprise". The association is engaged in, and its activities affect, interstate commerce.

128.    Upon information and belief, Defendants are each associated with the enterprise formed by an association in fact. The Defendants intended to fraudulent transfer assets to

18

individuals and other legal entities. Each individual defendant is distinct from this enterprise and has its own legitimate business.

129.    Alternatively, the Defendants each formed an enterprise through an association in fact, comprised of each company and its employees and agents. Each company or corporation is distinct from its employees and agents because of its role in the racketeering activity is separate from the legitimate activities the company or corporation conducts.

130.    Upon information and belief, each Defendant had a role in directing the affairs of each enterprise formed by an association in fact.

131.    Pursuant to 18 U.S.C. § 1961(5), the Defendants engaged in at least two acts of racketeering activity which occurred within ten years of each other.

132.    Pursuant to 18 U.S.C. § 1962(a), the Defendants received income derived, directly or indirectly, from a pattern of racketeering activity.

133.    Pursuant to 18 U.S.C. § 1962(a), the Defendants used or invested, directly or indirectly, part of such income or proceeds of such income, in acquisition of an interest in, or establishment or operation of an enterprise, which is engaged in, or the activities affect, interstate commerce.

134.    As a direct and proximate result of the Defendants' pattern of racketeering activity, White Hair suffered damages pursuant to 18 U.S.C. § 1964.

### COUNT X
### ACQUISITION AND CONTINUANCE OF AN INTEREST IN AND CONTROL OF AN ENTERPRISE IN A PATTERN OF RACKETEERING ACTIVITY PURSUANT TO 18 U.S.C. § 1962 (b)
### (All Defendants)

135.    White Hair incorporates herein by reference all of the allegations set forth above.

19

136.    Pursuant to 18 U.S.C. § 1962(b), the Defendants, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of an enterprise.

137.    Pursuant to 18 U.S.C. § 1962(b), this enterprise is engaged in, or activities of which affect, interstate commerce.

138.    As a direct and proximate result of the Defendants' pattern of racketeering activity, White Hair suffered damages pursuant to 18 U.S.C. § 1964.

**COUNT XI**
**ACQUISITION AND CONTINUANCE OF AN INTEREST IN AND CONTROL OF AN ENTERPRISE IN A PATTERN OF RACKETEERING ACTIVITY PURSUANT TO 18 U.S.C. § 1962 (c)**
**(All Defendants)**

139.    White Hair incorporates herein by reference all of the allegations set forth above.

140.    Pursuant to 18 U.S.C. § 1962(c), the Defendants were employed or associated with an enterprise that engaged in, or the activities of which, affect interstate commerce.

141.    The enterprise conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity.

142.    As a direct and proximate result of the Defendants' pattern of racketeering activity, White Hair suffered damages pursuant to 18 U.S.C. § 1964.

**COUNT XII**
**CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(a-c)**
**PURSUANT TO 18 U.S.C. § 1962(d)**
**(All Defendants)**

143.    White Hair incorporates herein by reference all of the allegations set forth above.

144.    Pursuant to 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(a-c).

20

145.    Defendants agreed to participate in the enterprise's conduct by engaging in a pattern of racketeering activity, as alleged, and further agreed to perform services which would facilitate the enterprise's unlawful conduct.

146.    As a direct and proximate result of the Defendants' pattern of racketeering activity, the White Hair suffered damages pursuant to 18 U.S.C. § 1964.

**COUNT XIII**
**SECTION 11 OF THE SECURITIES ACT OF 1933**
**(THE "33 ACT" OR "SECURITIES ACT")**
**(All Defendants)**

147.    White Hair incorporates herein by reference all of the allegations set forth above.

148.    As set forth above, the Loan and Transaction were joint enterprises conceived of and effectuated by the Defendants and were a "common enterprise" and/or companies, corporations, or entities, separately or together (the "Enterprises") regulated under the 33 Act.

149.    The Loan, Carbon Credits, Surety Bond, and Revenue Sharing Agreement are securities ("Securities") as defined under the 33 Act.

150.    As set forth above, the emails and related documents (the "Offering Materials") contained untrue statements of material fact and omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading. The misstated and omitted facts would have been material to a reasonable person reviewing the Offering Materials.

151.    Defendants owed to White Hair the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

21

152.    Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Offering Materials and did not possess reasonable grounds for believing that the Offering Materials did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

153.    Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

154.    White Hair did not know, nor in the exercise of reasonable diligence could it have known, of the untrue statements of material fact or omissions of materials facts in the Offering Materials when they purchased or acquired the Securities.

155.    Defendants are liable to White Hair for violations of Section 11 of the 33 Act.

## COUNT XIV
### SECTION 10 OF THE SECURITIES ACT OF 1934
### (THE "34 ACT" OR "EXCHANGE ACT")
### (All Defendants)

156.    White Hair incorporates herein by reference all of the allegations set forth above.

157.    As alleged herein, Defendants made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of Section 10(b) of the 34 Act and Rule 10b-5. In particular, this included representations related to the Loan, Transaction, Carbon Credits, Surety Bond, and Revenue Sharing Agreement

158.    The Defendants were individually and collectively responsible for making the material misrepresentations and omissions and engaging in a plan, scheme, and course of conduct

22

designed to deceive White Hair, by virtue of having prepared, approved, signed, and disseminated documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

159.     As set forth above, the Defendants made their false and misleading statements and omissions and engaged in deceptive conduct knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon White Hair.

160.     In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying on those statements, White Hair agreed to make the Loan and participate in the Revenue Sharing Agreement.

## COUNT XV
### SECTION 20(a) OF THE 34 ACT
### (Aizcorbe, Walker, Przybysz, and Smith)

161.     White Hair incorporates herein by reference all of the allegations set forth above.

162.     Aizcorbe, Walker, Przybysz, and Smith ("Individual Defendants") caused Gideon, Ingenuity, and Petron ("Entity Defendants") to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of Securities and by participating in a scheme and course of business or conduct.

163.     This conduct was undertaken with the scienter of the Individual Defendants who knew of or recklessly disregarded the falsity of the written and oral statements and the nature of its scheme.

164.     Upon information and belied and at all times relevant, the Individual Defendants were controlling persons of the Entity Defendants, due to their senior positions, direct involvement in their day-to-day operations, financing reporting, and accounting, and signatures on and

23

participation in the preparation and dissemination of their documents, notes, emails, and other written materials. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Entity Defendants.

165.    As set forth above, the Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon White Hair.

166.    In ignorance of the false and misleading nature of the statements and omissions, and relying on those statements and omissions, White Hair made the Loan and entered into the Revenue Sharing Agreement. But for the material misstatements and omissions, White Hair would not have entered into the Loan or Revenue Sharing Agreement.

167.    White Hair was harmed and damaged as a direct and proximate result of the Transaction, Loan, and Revenue Sharing Agreement.

<u>**COUNT XVI**</u>
**WISCONSIN UNIFORM SECURITIES LAW §§ 551**
**(All Defendants)**

168.    White Hair incorporates herein by reference all of the allegations set forth above.

169.    As alleged herein, Defendants made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct in violation of the Wisconsin Uniform Securities Law. In particular, each of the statements about the validity of the Carbon Credits and Surety Bond, as well as the opportunity to receive payments under the Revenue Sharing Agreement.

170.    The Defendants were individually and collectively responsible for making the material misrepresentations and omissions and engaging in a plan, scheme, and course of conduct designed to deceive White Hair, by virtue of having prepared, approved, signed, and disseminated

24

documents that contained untrue statements of material fact and omitted facts necessary to make the statements therein not misleading.

171.    As set forth above, Defendants made their false and misleading statements and omissions and engaged in deceptive conduct knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon White Hair.

172.    In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying on those statements, White Hair suffered harm made it made the Loan and entered into the Revenue Sharing Agreement.

## COUNT XVII
## BREACH OF CONTRACT
### (Petron)

173.    White Hair incorporates herein by reference all of the allegations set forth above.

174.    Under the terms of the Promissory Note, Petron had a duty to make a payment of principal and accrued interest in the amount of $3,000,000 to White Hair on or before April 14, 2022.  Despite said duty, Petron has failed to and refused to make said payment to White Hair.

175.    Under the terms of the Security Agreement, if the above payment was not made, Petron was to provide White Hair with Carbon Credits and the proceeds received pursuant to the Surety Bond.

176.    Upon information and belief, the Carbon Credits and Surety Bond are fraudulent. However, if valid, Petron is required said proceeds and Carbon Credits.

177.    As a result of Petron's failure and refusal to make the required payments and distributions to White Hair, it is breach of its contractual obligations and in default under the Promissory Note and Security Agreement.

178.     Pursuant to the Promissory Note, White Hair is entitled to its expenses and costs of collection, including, but not limited to its reasonable attorney's fees.

WHEREFORE, White Hair demands judgment against the Defendants as follows:

A.     Judgment against all Defendants, jointly and severally, in favor of White Hair, awarding compensatory damages for all fees and costs disbursements in an amount to be determined by the Court;

B.     Judgment against all Defendants, jointly and severally, in favor of White Hair, awarding compensatory damages, together with interest, reasonable attorneys' fees, costs, and disbursements in an amount to be determined by the Court;

C.     Judgement against all Defendants, jointly and severally, in favor of White Hair, awarding treble damages and all costs of investigation and litigation that were reasonably incurred pursuant to Wis. Stat. §§ 779.02(5), 895.80 and 943.20.

D.      To the extent there are any tax liabilities or exposure for White Hair due to Defendants' fraudulent conduct, White Hair requests to be indemnified, held harmless and defended by Defendants, jointly and severally, for such liabilities and/or exposure;

E.     For Count VIII (Wis. Stat. § 946.83 claims), in addition to the prayers for relief set forth above, White Hair further prays for a judgment requiring that Defendants:

1.     Divest interest in any enterprise related to these causes of action;

2.     Pay to White Hair all damages, twofold;

3.     Return all property that lawfully belongs to White Hair;

4.     Return to White Hair all proceeds that were made from the fraudulently transferred property;

5.    Pay White Hair interest on such fraudulently transferred property;

6.    Pay to White Hair all other damages White Hair suffered as the result of the Defendants' actions, punitive damages, White Hair's costs and reasonable attorneys' fees; and

7.    Such other relief this Court seems just and proper.

F.    For Count IX through Count XII (18 U.S.C. § 1962 claims), in addition to the prayers for relief set forth above, White Hair further prays for a judgment requiring that Defendants:

1.    Divest any interest in any enterprise related to these causes of action;

2.    Pay to White Hair all damages, threefold;

3.    Return all property that lawfully belongs to White Hair;

4.    Return to White Hair all proceeds that were made from the fraudulently transferred property;

5.    Pay White Hair's interest on such fraudulently transferred property;

6.    Pay to White Hair all other damages White Hair suffered as the result of Defendants' actions, including White Hair's costs and reasonable attorneys' fees;

7.    Such other relief this Court seems just and proper.

G.    Judgment on all claims in such amounts as established by the Court, together with any statutory fees, costs, and disbursements as the Court deems appropriate or just;

H.    Actual damages, together with all costs of investigation and litigation that White Hair reasonably incurred;

27

I.      Exemplary damages of not more than three times the amount awarded for actual damages;

J.      Pre-judgment interest, plus the costs and disbursements of this action;

K.      Actual attorneys' fees; and

L.      Any such other and further relief as the Court deems just and equitable.

Dated at Green Bay, Wisconsin, this 28th day of April, 2023.

**A TRIAL BY A JURY OF TWELVE IS HEREBY DEMANDED**.

**DEWITT LLP**,

By:     *Electronically signed by Brian T. Flood*
        Brian T. Flood (1061313)
        2391 Holmgren Way, Suite A
        Green Bay, WI 54304
        Telephone: (920) 499-5700
        Facsimile: (920) 499-9790
        Email: bflood@dewittllp.com

        **Attorneys for White Hair Solutions, LLC**

28





**AXA / Lloyd's Underwriters**

NAIC 33022                                                    CCID 1470-4

# PERFORMANCE / SURETY BOND

Bond No.:     LUAIPB21821                    Contract No:     PL_GCIM_20210823

## SURETY

WE, ████████TD, Bank & Trust, and through████████XA/Lloyd's Reinsurers and Underwriters, a Surety Company, located at ████████████████████████████████████
and ████████████████████████████████████, do hereby agree to the following:

In consideration of the agreed premium, the Surety, hereby agrees to indemnify the Insured, ████████████,
and ████████████, against any loss of money or other property or total breach of contract, which the insured shall sustain or for which the insured shall incur liability to any Customer or Subscriber or Client of the Insured acting alone or in collusion with others, the amount of the indemnity on each of such Employees being One Million United States Dollars ($1,000,000.00 USD) representing the ████████████████████
Agreement **DSI_PL_GCIM_20210823** and ████████████ **PL-GCIM-100MUS-20210823**. Any claim against this Policy shall be paid to GIDEON CAPITAL INVESTMENT & MANAGEMENT, LLC.

THE FOREGOING AGREEMENT IS SUBJECT TO THE FOLLOWING CONDITIONS AND LIMITATIONS:

**TERM OF BOND: SECTION 1**.  The term of this bond begins with the day of September 02, 2021, 12:01 am, Eastern Standard Time at the address of the Insured above given, and ends on the day of September 01, 2022, 11:59 pm Eastern Standard Time standard time, on the effective date of the cancellation of this bond in its entirety or when the contract as referenced above has been completed or if ████████████████████████████
████████████████████.

**EXCLUSION: SECTION 2**. In addition, the policy does not apply to the defense of any legal proceedings brought against the Insured, or to fees, costs or expenses incurred or paid by the Insured in prosecuting or defending any legal proceedings whether or not such proceedings results or would result in a loss to the Insured covered by this

Initialed By: _TN_                                                                                    1

**EXHIBIT A**





**BANK & TRUST**

AXA / Lloyd's Underwriters

NAIC 33022                                      CCID 1470-4

policy. In addition, the Company shall not be liable for any costs, fees and other expenses incurred by the Insured in establishing the existence or the amount of loss covered under this policy.

**DISCOVERY PERIOD: SECTION 3**. Loss is covered under this bond only (a) if sustained through any act or acts committed by any Employee of Insured while this bond is in force as to such Employee, and (b) if discovered prior to the expiration or sooner cancellation of this bond in its entirety as provided in Section 10, or from its cancellation or termination in its entirety in any other manner, whichever shall first happen.

**DEFINITION OF EMPLOYEE: SECTION 4**. The word Employee or Employees, as used in this bond, shall be deemed to mean, respectively, one or more of the natural persons (except directors or trustees of the Insured, if a corporation, who are not also officers or employees thereof in some other capacity) while in the regular service of the Insured in the ordinary course of the Insured's business during the term of this bond, and whom the Insured compensates by salary, or wages and has the right to govern and direct in the performance of such service, and who are engaged in such service within any of the States of the United States of America, or within the District of Columbia, Puerto Rico, the Virgin Islands, or elsewhere for a limited period, but not to mean brokers, factors, commission merchants, consignees, contractors, or other agents or representatives of the same general character.

**FRAUDULENT OR DISHONEST ACT: SECTION 5**. A FRAUDULENT OR DISHONEST ACT OF AN EMPLOYEE OF THE INSURED SHALL MEAN AN ACT WHICH IS PUNISHABLE UNDER THE CRIMINAL CODE IN THE JURISDICTION WITHIN WHICH ACT OCCURRED, FOR WHICH SAID EMPLOYEE IS TRIED AND CONVICTED BY A COURT OF PROPER JURISDICTION.

**MERGER OR CONSOLIDATION: SECTION 6**. If any natural persons shall be taken into the regular service of the Insured through merger or consolidation with some other concern, the Insured shall give the Surety written notice thereof and shall pay an additional premium on any increase in the number of Employees covered under this bond as a result of such merger or consolidation computed pro rata from the date of such merger or consolidation to the end of the current premium period.

**NON-ACCUMULATION OF LIABILITY: SECTION 7**. Regardless of the number of years this bond shall continue in force and the number of premiums which shall be payable or paid, the liability of the Surety under this bond shall not be cumulative in amounts from year to year or from period to period. Form 1432-C-3-88

**LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE: SECTION 8**. With respect to loss or losses

Initialed By: _JN_



2

EXHIBIT A





**BANK & TRUST**

AXA / Lloyd's Underwriters

NAIC 33022                                        CCID 1470-4

caused by an Employee or which are chargeable to such Employee as provided in Section 5 and which occur partly under this bond and partly under other bonds or policies issued by the Surety to the Insured or to any predecessor in interest of the Insured and terminated or cancelled or allowed to expire and in which the period for discovery has not expired at the time any such loss or losses thereunder are discovered, the total liability of the Surety under this bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried under this bond on such loss or losses or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss or losses, if the latter amount be the larger.

**SALVAGE: SECTION 9**.  If the Insured shall sustain any loss or losses covered by this bond which exceed the amount of coverage provided by this bond, the Insured shall be entitled to all recoveries, except from suretyship, insurance, reinsurance, security or indemnity taken by or for the benefit of the Surety, by whomsoever made, on account of such loss or losses under this bond until fully reimbursed, less the actual cost of effecting the same; and less the amount of the deductible carried on the Employee causing such loss or losses; and any remainder shall be applied to the reimbursement of the Surety.

**CANCELLATION AS TO ANY EMPLOYEE: SECTION 10**.  This bond shall be deemed cancelled as to any Employee: (a) immediately upon discovery by the Insured, or by any partner or officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee; or (b) at 12:00 o'clock night, standard time, upon the effective date specified in a written notice served upon the Insured or sent by mail.  Such date, if the notice be served, shall be not less than ten days after such service, or, if sent by mail, not less than fifteen days after the date of mailing.  The mailing by Surety of notice, as aforesaid, to the Insured at its principal office shall be sufficient proof of notice.

**CANCELLATION AS TO BOND IN ITS ENTIRETY: SECTION 11**.  This bond shall be deemed cancelled in its entirety at 12:00 o'clock night, standard time, upon the effective date specified in a written notice served by the Insured upon the Surety or by the Surety upon the Insured, or sent by mail.  Such date, if served by the Surety, shall be not less than ten days after such service, or if sent by the Surety by mail, not less than fifteen days after the date of mailing.  The mailing by the Surety of notice, as aforesaid, to the Insured at its principal office shall be sufficient proof of notice.  The Surety shall refund to the Insured the unearned premium computed pro rata if this bond be cancelled at the instance of the Surety, or at short rates if cancelled or reduced at the instance of the Insured.

**PRIOR FRAUD, DISHONESTY OR CANCELLATION: SECTION 12**.  No Employee, to the best of the knowledge of the Insured, or of any partner or officer thereof not in collusion with such Employee, has committed any fraudulent or

Initialed By: _JN_



3

**EXHIBIT A**





## BANK & TRUST

**AXA / Lloyd's Underwriters**

NAIC 33022                                                     CCID 1470-4

dishonest act in the service of the Insured or otherwise. If prior to the issuance of this bond, any fidelity insurance in favor of the Insured or any predecessor in interest of the Insured and covering one or more of the Insured's Employees shall have been cancelled as to any of such Employees by reason of (a) the discovery of any fraudulent or dishonest act on the part of such Employees, or (b) the giving of written notice of cancellation by the insurer issuing said fidelity insurance, whether the Surety or not, and if such Employees shall not have been reinstated under the coverage of said fidelity insurance or superseding fidelity insurance, the Surety shall not be liable under this bond on account of such Employees unless the Surety shall agree in writing to include such Employees within the coverage of this bond.

**LOSS-NOTICE-PROOF-LEGAL PROCEEDINGS: SECTION 13**.  At the earliest practical moment, and at all events not later than fifteen days after discovery of any fraudulent or dishonest act on the part of any Employee by the Insured, or by any partner or officer thereof not in collusion with such Employee, the Insured shall give the Surety written notice thereof and within four months after such discovery shall file with the Surety affirmative proof of loss, itemized and duly sworn to, and shall upon request of the Surety render every assistance, not pecuniary, to facilitate the investigation and adjustment of any loss.  No suit to recover on account of loss under this bond shall be brought before the expiration of two months from the filing of proof as aforesaid on account of such loss, nor after the expiration of fifteen months from the discovery as aforesaid of the fraudulent or dishonest act causing such loss.  If any limitation in this bond for giving notice, filing claim or bringing suit is prohibited or made void by any law controlling the construction of this bond, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

**PART-TIME OR TEMPORARY EMPLOYEES: SECTION 14**.  The named Insured shall not at any time while this bond is in force direct any temporary or part-time Employee(s) to any subscriber's premises unless such Employee(s) is accompanied by a foreman who is in the regular employ of the Insured.

## PERFORMANCE

WE, ▮▮▮▮▮▮▮▮ Bank & Trust, and through▮▮▮▮▮▮▮, AXA/Lloyd's Reinsurers and Underwriters, a Surety Company, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ USA, do hereby agree to the following:

In consideration of the agreed premium, the Surety, hereby agrees with full bank responsibility and authority, does hereby irrevocably and unconditionally without protest or notification undertake to pay an amount not exceeding Two Million United States Dollars ($2,000,000.00 USD) being two per cent (2%) Performance Bond of One Hundred



Initialed By: _JN_                                                                    4

EXHIBIT A





**AXA / Lloyd's Underwriters**

NAIC 33022                                                                        CCID 1470-4

Million United States Dollars ($100,000,000.00 USD) against any loss of money or other property or total breach of contract, which the insured shall sustain or for which the insured shall incur liability to any Customer or Subscriber or Client of the Insured acting alone or in collusion with others, under ███████████ Contract **PL GCIM-100MUS-20210823**. Any claim against this Policy shall be paid to GIDEON CAPITAL INVESTMENT & MANAGEMENT, LLC.

THE FOREGOING AGREEMENT IS SUBJECT TO THE FOLLOWING CONDITIONS AND LIMITATIONS:

**The amount of the Performance Bond shall be** an amount not exceeding Two Million United States Dollars ($2,000,000.00 USD) being two per cent (2%) Performance Bond of One Hundred Million United States Dollars ($100,000,000.00 USD) against any loss of money or other property or total breach of contract, which the insured shall sustain or for which the insured shall incur liability to any Customer or Subscriber or Client of the Insured acting alone or in collusion with others, under ███████████ Contract **PL-GCIM-100MUS-20210823**.and which Performance Bond one (1) year and one (1) month.

The Surety does hereby guarantee the good performance of the obligation assumed toward the Insured and the Beneficiaries in accordance with the above-mentioned contract. In the event the Insured fails to carry out and fulfill their obligation, we irrevocably undertake to hold the said amounts at Beneficiaries disposal, free of interest and fees, and subject to the limit of an amount not exceeding Two Million United States Dollars ($2,000,000.00 USD) being two per cent (2%) Performance Bond of One Hundred Million United States Dollars ($100,000,000.00 USD) for the term contract, payable to Beneficiaries nominated bank account within five banking days on Beneficiaries first written demand by Beneficiaries bank proving that the Insured has failed to perform their obligations pursuant to ███████ ████████ Contract **PL-GCIM-100MUS-20210823**, accompanied by fully executed Certified Legal Declaration, confirmation of Insured's failure to perform through a full investigation by ███████████████████nd Trust, Allend██████nd/or Lloyd's, and not withstanding any attestation by the Insured. Claims, if any, must be received by █████████████████████ the maturity on the day of September 01, 2022, 11:59 pm Eastern Standard Time, on the effective date of the cancellation of this bond in its entirety, and must include legal proof of Insureds failure to perform and Beneficiaries written legal demand for Insured to Perform.

This Performance Bond shall come into force from its full payment and issuance, and shall be valid for one year and one month from the date of our receipt and confirmation ████████████████████████████. ███████ Agreement **DSI_PL_GCIM_20210823**. This Performance Bond is valid until on the day of September 01, 2022, 11:59 pm Eastern Standard Time standard time, on the effective date of the cancellation of this bond in its entirety or when the contract as referenced above has been completed or if ████████████████.

Initialed By: _TN_                                                                                       5



**EXHIBIT A**



**BANK & TRUST**

AXA / Lloyd's Underwriters

NAIC 33022        CCID 1470-4

confirmed deposit, and any claims must be received by ████████████, Bank and Trust, Allende, Inc., on or before this date, after which our liability to Beneficiaries and Insured under this Performance Bond will cease and this guarantee will be of no further effect.

This Performance Bond shall not be legally enforceable in the event fraud is found or discovered by Surety, Insured or Beneficiaries, and ██████████, and Allende, Inc., shall be indemnified and relieved of any and all obligations hereunder in the event fraud is found or discovered committed by either Insured or Beneficiaries.

This Performance Bond may be extended from year to year under written legal Codicil as ████████████Contract **PL-GCIM-100MUS-20210823** is extended under written legal Codicil by Insured and Beneficiaries for the same period.

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\



Initialed By: _JN_        6

EXHIBIT A



# ███ BANK & TRUST

**AXA / Lloyd's Underwriters**

NAIC 33022                                    CCID 1470-4

THIS PERFORMANCE BOND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA.

THIS PERFORMANCE BOND IS SUBJECT TO THE ICC UCP 600 CURRENT VERSION.

**FOR AND ON BEHALF OF** ██████████████████████████

AUTHORIZED SIGNATORY: ███████ia, CEO                    ██████████ CEO

**FOR AND ON BEHALF OF** AXA/LLOYD'S UNDERWRITER

AUTHORIZED SIGNATORY: John Neal, CEO                    *John Neal, CEO*

**ACCEPTED BY:**

**FOR AND ON BEHALF** OF GIDEON CAPITAL INVESTMENT & MANGEMENT, LLC

AUTHORIZED SIGNATORY:

Diego Aizcorbe
_____                    _____
Name                                           Signature

Chuck Walker
_____                    *Chuck Walker*
Name                                           Signature



Initialed By: _JN_                                                    7

# REVENUE SHARING AGREEMENT

This Revenue Sharing Agreement (the "Agreement") dated as of September 30, 2021 is by and between **Ingenuity Consulting Services LLC ("Ingenuity")** a Michigan limited liability company located at 1759 Oakvale Dr. SW Wyoming, Michigan 49519**, and _____ ("Company"), _____, together are the Parties**.

WHEREAS, Ingenuity is desirous of being involved in the business of Financing/Funding/Capital creation (collectively referred to as "Services").

WHEREAS, Ingenuity was created for several purposes, including funding/revenue generation and it has contacts and connections in the Services verticals as well as contacts and connections that are in other Verticals.

WHEREAS, the Company has capital to assist in the Services under mutually agreeable terms and conditions.  The first transaction involves monetizing Carbon Credits as outlined in the contract between Gideon Capital Investments & Management (Gideon) and Petron Energy II.

WHEREAS, the Parties have agreed to establish this Agreement for the purposes of working together and maximizing the opportunities that present in the Services verticals.

NOW THEREFORE, in consideration of the mutual covenants and obligations set forth in this Agreement, the Parties agree as follows:

1.)   **Ingenuity**.       Ingenuity has presented this participation opportunity and will also provide to Company the right of first refusal to participate in transactions like this first Carbon Credit Deal on all future financing needs that Ingenuity will process.

2.)   **Company.**  Company agrees that it will provide all its knowledge and financial capabilities as necessary to complete the financing of the transactions after a thorough Due Diligence and retains the rights to terminate its involvement in the contemplated transaction as its discretion.

3.)   **Management.**  Ingenuity with its Joint Venture partner Gideon will be responsible for managing all operational aspects of the transaction for the provision of the Services and will collaborate with the Company using best efforts to meet the needs of Ingenuity's Clients or contacts.  To the extent that anything in addition to these Services are required for any transactions involving the contemplated transaction, Ingenuity shall work with the Company to develop and present the best solution. Ingenuity will retain control of the process and be the Party responsible for setting up the transaction for its Clients and the best process to benefit all involved.

1

EXHIBIT B

4.)    **Revenue Sharing**.   Ingenuity and the Company hereby agree that the Company shall be compensated in the following manner for placing the funds necessary to secure the Insurance wrap on behalf of Ingenuity's Client:

A.   The following Schedule will be applied for the Compensation to the Company.

| Entity | Capital Return | ROI Timeframe |
|--------|----------------|----------------|
| Company | 150% of the provided funds | From the 1st payout |
| Company | 150% of the provided funds | From the 2nd payout |

B.   Capital Return:
The Capital Return shall be defined as the equivalent of financing provided at a 200% rate ($1,000,000 shall return $3,000,000 or prorated the same ratio).

C.   ROI Timeframe:
The timeframe for payments to be made shall coincide with the timeframe attached to the transaction documents.  The payments to the Company shall come from each of the first two payments received by Ingenuity. Payments shall be made to the Company within 48 hours of any Revenues being received by Ingenuity or as mutually agreed.  Payments shall be made via EFT to the banking coordinates supplied by the Company.  It is noted that this first transaction due to the unique situation, is expected to generate the first payout in about 30 days and the second within 8-10 weeks from the transfer of financing funds.

5.)    **Ownership**. Neither Party will have ownership in the other Party as this Agreement is established to work together and the Revenue Share for those efforts.

6.)    **Additional Obligations of the Parties.**

A.   Ingenuity shall be responsible for:

i)   Using its experience, business acumen and relationships to maintain and expand Opportunities in the Services sectors with additional Clients.
ii)  Coordinating the complete due diligence and providing contract terms on all transactions to be used for any Services.
iii) All other reasonable requests to assist with successful completion of the transaction.

B.   Company shall be responsible for:

i)   Assisting Ingenuity with financing when needed by the Carbon Credit owners to provide the required 10% of the insurance wrap.

2

EXHIBIT B

ii)  Assisting with facilitating this financing process as expeditiously as the Company is comfortable with including appropriate time to perform their necessary Due Diligence of the transaction and the participants.
iii)  All other reasonable requests to assist with successful completion of the transaction.

7.)     **Proprietary Information.**     During the term of this Agreement, the Parties may find it necessary to disclose to each other certain "Proprietary Information", which shall refer to all investor, funding, planning, technical, regulatory, marketing, financial and commercial information, or data, whether communicated in writing or orally, which is provided by one party to the other party in connection with this Agreement (the "**Proprietary Information**"). The terms of this Agreement shall also be regarded as Proprietary Information by both parties.  No Proprietary Information may be disclosed by either party to third parties without the advance written approval from the other party.  Notwithstanding anything above, disclosure of the general existence of a relationship between the parties shall be exempt from this requirement as necessary for either party to further its mission and business practices without undue restriction or hardship.

8.)     **Confidentiality; No circumvention; No Advertisement**. The Parties agree to keep confidential any information they may acquire as a result of this Agreement regarding the business and affairs of the other, including, without limitation, the identity of each other's clients, contacts, and connections.  No Party shall, without the prior written consent of the other Party, place any advertisement in any media whatsoever or, except as provided herein, make any written communication addressed to any client, potential client or other third party if such advertisement or communication in any manner makes reference to the other Party or the uniqueness of the Product or Services. Parties agree not to circumvent the other since the contacts are Confidential and Proprietary Information, as outlined in Section 10 paragraph I, for the term of this Agreement and the 12-month period of time after termination.

9.)     **Term, Termination; Survival**. This Agreement shall commence on the date that the last signature is affixed hereto and shall continue for an initial period of time of twelve months (12).  This Agreement may be terminated by either Party if the other party is in breach of any provision of this agreement, provided that said breach has not been corrected within fifteen (15) days of offending party receiving written notice of said breach. Termination must be provided by written notice given to the other Parties. Termination of this agreement shall not relieve the obligation for the sharing of any Net Revenues generated from purchase, sales, or service agreements in place as of the date of termination as outlined in Section 4 a. & b. and Section 5 above, even if transactions under any previous purchase, sales and/or services agreement occur after the termination of the Agreement.  This Agreement shall automatically renew for successive continuous twelve-month (12) periods of time if neither Party provides

3

EXHIBIT B

written notice of Termination within thirty days (30) of Termination Date. The Confidentiality and Non-Circumvention portions of Section 8 above shall endure for an additional twelve-month (12) period after the termination has been completed.

10.) **General**

A. **Entire Agreement; Waiver; No Assignment**. This Agreement constitutes the complete and exclusive statement of the agreement between the Parties as relates to the subject matter hereof and supersedes all proposals, oral or written, and all other representations, statements, negotiations, and undertakings relating to the subject matter. No change in, addition to, or waiver of any of the provisions of this Agreement shall be binding upon either Party unless in writing signed by an authorized representative of such Party. No waiver by either Party of any breach by the other Party of any of the provisions of this Agreement shall be construed as a waiver of any other provision or that provision on any other occasion. Neither Party may assign this Agreement and/or any of its rights and/or obligations hereunder without the prior written consent of the other Party and any such attempted assignment shall be void.

B. **Notices**. Any notice required or permitted to be given under this Agreement shall be given in writing and shall be deemed to have been delivered and given (a) when delivered personally; (b) three (3) business days after having been sent by registered or certified U.S. mail, return receipt requested, postage and charges prepaid; or (c) one (1) business day after deposit with a commercial overnight courier, with written verification of receipt. All communications will be sent to the following addresses or to such other address as may be designated by a Party by giving written notice to the other Party pursuant to this Section 10.

>To: Company
>Ingenuity Consulting Services LLC
>1759 Oakvale Dr SW
>Wyoming, Michigan 49519
>Attn:  Robert Przybysz
>Telephone:  616-893-4879
>e-mail: Przybyszb12@protonmail.com

>To _____:
>_____
>_____
>_____
>Attn:
>Telephone:

4

EXHIBIT B

e-mail:

C. **Severability**. In the event any one or more of the provisions of this Agreement shall be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remaining provisions of this Agreement shall remain in effect and this Agreement shall be read as though the offending provision had not been written.

D. **Headings**. The captions and headings used in this Agreement are inserted for the convenient reference of the Parties and in no way define, limit, or describe the scope or intent of this Agreement or any part hereof.

E. **Injunctive Relief**. Each Party hereby acknowledges and agrees that damages at law may be inadequate remedies for the breach of Sections 4, 7 and 8.  Accordingly, each Party agrees that the other Party may be entitled to temporary and permanent injunctive or other equitable relief with respect to any such breach. The rights set forth in this Section 10(e) shall be in addition to any other rights that either Party may have at law or in equity.

F. **No Agency Relationship**. No Party shall hold itself out as an agent of any other Party. Neither this Agreement, nor any activity thereunder, shall create a general or limited partnership, association, joint venture, branch, or agency relationship between any other Party or Parties.

G. **Counterparts**. This Agreement may be signed in counterparts, each of which shall be deemed effective as if each Party had signed each of such counterparts.

H. **Governing Law**. This Agreement shall be subject to and governed by the laws of Michigan and shall be enforced in any Court of Competent Jurisdiction in Kent County Michigan.

I. **Non-Circumvention**.    The Parties agree not to directly or indirectly circumvent, avoid, bypass, or exclude each other regarding any contacts, transactions with corporations, partnerships, limited liability companies, proprietorships, trusts, individuals, or other entities introduced by either Party, including any affiliates or subsidiaries of either Party.

IN WITNESS WHEREOF, each Party has caused the original or a counterpart of the original of this Agreement to be executed as of the date first written above by its duly authorized representative.

5

EXHIBIT B

A _____

By: _____

Name: _____
Title: _____

**Ingenuity Consulting Services LLC**
A Michigan limited Liability Company

By: *Robert A. Przybysz*

Name: Robert Przybysz
Title: CEO and Managing Member

6

EXHIBIT B

# PROMISSORY NOTE

**$3,000,000.00**

Dallas, Texas
10/14/21

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES OR BLUE SKY LAWS AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, HYPOTHECATED, OR OTHERWISE ASSIGNED EXCEPT (1) PURSUANT TO A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE ACT OR (2) PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE ACT RELATING TO THE DISPOSITION OF SECURITIES AND (3) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES AND BLUE SKY LAWS.

**FOR VALUE RECEIVED**, Petron Energy II ("Borrower") promises to pay White Hair Solutions, LLC ("Lender") the total of all principal sums borrowed under this Promissory Note (" Note"). Under this Note, Borrower borrows One Million Dollars ($1,000,000.00) in lawful money of the United States.

**RETURN PAYMENT. ("Payment"),** Lender shall re-pay to Borrower, a total of Three Million Dollars ($3,000,000).

**DUE DATE**. The Payment under this Note shall be paid in full on or before April 14, 2022 ("Due Date").

**LATE PENALTY**. On demand, Borrower shall assign the Two Hundred Fifteen Thousand Fifty-Four (215,054) Carbon Credits should that payment that is due not have been received by Lender on or before the Due Date. Payment of Two Hundred Fifteen Thousand Fifty-Four (215,054) Carbon Credits shall be payment in full.

**PARTIAL PAYMENT**. Borrower shall have the right to make Partial Payments on this Note, at any time. Partial Payments shall be applied to the Return Payment amount resulting in a new Adjusted Balance ("Adjusted Balance") due. Partial Payments may continue until the full Return Payment has been received. Any new Adjusted Balance will provide a corresponding decrease in the net number of Carbon Credits owed should a default occur. Any such prepayments shall not extend or postpone the Due Date, unless the Lender, successor or assign ("Holder") shall otherwise agree in writing.

**DEFAULT**. In the event of any default in the payment of this Note, or the breech of any covenant contained herein, the entire Return Payment or if applicable the Adjusted Balance thereon shall at once become due and payable, without notice, at the option of the Holder. Failure to exercise this option shall not constitute a waiver of the right to exercise such option. If, upon default, the same is referred to an attorney at law for collection or suit is brought hereon, the Borrower shall pay the Holder, in either case, all expenses and costs of collection, including, but not limited to, reasonable attorney's fees.

EXHIBIT C

**EXTENSION**. From time to time, without affecting the obligation of the Borrower to pay the Return Payment of this Note and to observe the covenants contained herein, and without affecting the security of Borrower for payment of the Return Payment or outstanding Adjusted Balance of this Note, and without giving notice to, or obtaining the consent of, the Borrower, and without liability on the part of the Holder, the Holder may, at the option of the Holder, extend the time for payment of said outstanding principal balance and/or accrued interest or any part thereof or reduce the payments thereon.

**OTHER**. Presentment, demand for payment, notice of non-payment, protest, and all exemptions are hereby waived by all makers, sureties, guarantors and endorsers hereof. This Note shall be binding upon all makers and their heirs, personal representatives, successors and assigns.

**BORROWER – Petron Energy II, Inc**

Floyd Smith-CEO

# SECURITY AGREEMENT

**Petron Energy II Inc.** 17950 Preston RD #960, Dallas TX 75252("Company"), for value received, grants to White Hair Solutions, LLC ("Secured Party") a security interest in the following collateral of Company's business, that specific portion two hundred fifteen thousand fifty four (215,054) of the Carbon Credits as part of the whole thirty four million (34,000,000 ) metric tons certificate on Deposit (the "Collateral") attached to this Agreement.

This Security Agreement secures

1.     Company's obligations under a certain Loan Agreement dated October 15, 2021 (the "Loan") and this Security Agreement.

2.     The repayment of the three million dollar ($3,000,000) return as stated in the Loan:

a.     should Ingenuity not be able to pay the three million dollars from proceeds according to the Contract it has with Secured Party, due to default under the terms of the Petron-Gideon Contract. This repayment shall first come from collection of proceeds according to the Lloyd's Surety Bond assigned to the Company as the beneficiary of said Surety Bond.

b.     should the Company not receive its three million dollars from Lloyd's on or before one hundred and eighty (180) days to be able to pay the Secured Party, the Company shall transfer ownership of two hundred fifteen thousand fifty-four (215,054) Carbon Credits currently stored in Global Trust Depository or any other location the Carbon Credits may be stored. This amount at the nine dollar and thirty cent ($9.30) current price equals the two-million-dollar obligation.

The Collateral shall remain on Deposit with Global Trust Depository unless mutually agreed upon alternative transfer and safe keeping arrangements are made. Company warrants that the Collateral is and will remain free of liens and encumbrances and that no adverse financing statements or similar documents regarding the Collateral are or will be on file in a public office.

**EXHIBIT D**

Company agrees that

1.    Company must maintain the Collateral in good condition, at Company's expense, and discharge all taxes, levies, etc., on the Collateral.

3.    Company has deposited the Carbon Credit Certificate with Global Trust Depository and has obtained a Safe Keeping Receipt, which a copy can be provided upon request.

4.    Company must permit secured party access to where the Collateral is located and to examine it at any time, provided if there is a cost, that cost is paid by the Secured Party.

5.    Company may not sell or otherwise dispose of Collateral without prior written consent from Secured Party which will not be unreasonably withheld as long as the proceeds first pay off the amounts owed to the Secured Party.

8.    at the option of Secured Party, any obligations secured by this agreement become immediately due if Company defaults.

The occurrence of any of the following shall, at the option of Secured Party, constitute a default:

1.    any failure of Company to perform an obligation under this Agreement or of a warranty under this Agreement or Company's obligation under the Loan, or the incorrectness of any representation or warranty contained in this Security Agreement or the Loan.

2.    the transfer or disposition of any of the Collateral, except as expressly permitted by this Security Agreement.

3.    attachment, execution, or levy on any of the Collateral.

4.    Company voluntarily or involuntarily becoming subject to any proceeding under

a.    the Bankruptcy Code or

b.    any similar remedy under state statutory or common law.

5.    Company's failure to comply with, or becoming subject to any administrative or judicial proceeding under any federal, state, or local

a.    hazardous waste or environmental law,

b.    asset forfeiture or similar law that can result in the forfeiture of property, or

c.    other law, where noncompliance may have any significant effect on the Collateral.

EXHIBIT D

Dated: 10/15/2021

**Petron Energy II, Inc**
*Company*

By: _____
Floyd Smith

Its: CEO

Dated: 10/15/2021

WHITE HAIR SOLUTIONS LLC
*Secured Party*

By: David C Stork

Its: Managing Member

**EXHIBIT D**